1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11  WENDY A. MAKI,

12                          Plaintiff,

13          vs.

14

15  BREMERTON SCHOOL DISTRICT,
    LINDA SULLIVAN-DUDZIC , and her
16  marital community, SUSAN K. STONE, and
    her marital community.

17                          Defendants.

18

19

NO. 3:18-cv-05372-RJB

**COMPLAINT
AND JURY DEMAND**

20

21          **COMES NOW** Plaintiff, Wendy A. Maki, by and through her attorneys of

22  record, Deborah A. Boe and Daniel C. Gallagher, and claims as follows:

23                              **I. INTRODUCTION**

24          1.1    Plaintiff Wendy Maki brings this action on behalf of herself.

25          1.2    Defendant, Bremerton School District, is a public school district located in

26  Bremerton, Kitsap County, Washington.

27

COMPLAINT AND JURY DEMAND - 1

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

1.3    Defendant employs Plaintiff as a special education teacher at Kitsap Lake Elementary School.  This action arises out of Defendant's hostile work environment and retaliation following Plaintiff's complaints about inappropriate physical contact and possible sexual misconduct with students by a paraeducatorin her classroom.  Defendant's retaliation included locking Plaintiff in a room alone with a known violent student in violation of Defendant's policies which did result in attacks on, and harm to, Plaintiff.

1.4    Upon information and belief Defendant knew or should have known that its administrators, staff, and employees were likely to and did engage in, foster, allow and perpetuate a hostile work environment exposing Plaintiff to unnecessary risk of physical and emotional harm.  Despite Plaintiff 's numerous verbal and written complaints about the inappropriate behavior by the paraeducatoras well as her stated opposition to violation of policies like Pro-ACT, and to her being locked in a classroom with a known violent student, Defendant ignored, dissembled, and ultimately retaliated against Plaintiff causing her to suffer deprivation of her civil and statutory rights, physical, mental and emotional distress, and loss of income.

## II. JURISDICTION AND VENUE

2.1    <u>Jurisdiction</u>.  This Court has jurisdiction pursuant to the provisions of 42 U.S.C. § 1983; and supplemental jurisdiction over state claims pursuant to 28 U.S.C. § 1367.

2.2    <u>Venue</u>.  Venue is proper in the Western District of Washington because Defendant BREMERTON SCHOOL DISTRICT is located in this jurisdiction, and the events which gave rise to this lawsuit occurred in Kitsap County, Washington, within the Western District of Washington.

2.3    <u>Governing Law</u>:  The claims of Plaintiff asserted in this complaint are brought under federal and state causes of action and federal and state laws apply.

2.4    <u>Jurisdictional Prerequisites</u>:  Plaintiff timely filed a notice of tort claim with BSD on June 20, 2019.

COMPLAINT AND JURY DEMAND - 2

### III. PARTIES

3.1     Plaintiff Wendy Maki, a married woman, resides in Mason County, Washington and has been employed by Defendant in Kitsap County since August 2015.

3.2     Defendant Bremerton School District is a political subdivision of the State of Washington located in Kitsap County, Washington.

3.3     Defendant Linda Sullivan-Dudzic is the Director of Elementary Education and Special Programs for Bremerton School District and was employed as such since at least 2015.

3.4     Defendant Susan Stone was the Principal of Kitsap Lake Elementary in the Bremerton School District from approximately August, 2016 to June, 2018.

### IV. FACTUAL ALLEGATIONS

4.1     Plaintiff began her employment with Defendant ('BSD') in 2015 as a substitute teacher in special education.

4.2     Plaintiff's passion for teaching in special education led her to enroll in a Masters of Education in Special Education program.

4.3     In the summer of 2016, Plaintiff was interviewed for two open teaching positions with BSD.  Plaintiff was offered both positions.  Plaintiff accepted the position teaching special education at Kitsap Lake Elementary ('KLE').

4.4     Although BSD is required by WAC 181-79A-231 to provide teachers with a conditional certificate specific support including 'a mentor within twenty working days from the commencement of the assignment; and a written plan of support will be developed within twenty working days from the commencement of the assignment,' those requirements were not met by BSD.

4.5     During August 2016, Plaintiff spoke with several BSD employees who warned her that the paraeducator assigned to her classroom, Ms. LaLanne, had 'boundary issues' with student.  Ms. Shipp told Plaintiff that she witnessed Ms. LaLanne drag a nonverbal, autistic student down a hallway by his legs. Although Plaintiff and Ms. Shipp shared this information and their own recent observations of Ms. LaLanne including hugging children deep into her

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

breasts and other clear boundary violations with BSD Director of Human Resources, Denise Kennedy, on February 3, 2017, BSD took no corrective action.

4.6     In anticipation of problems with Ms. LaLanne's past behavior as represented by the teachers who had warned her, Plaintiff created a paraeducatorhandbook outlining ISP staff expectations, including appropriate physical boundaries between paraprofessionals and students.   Plaintiff then met with ISP staff including Ms. LaLanne and Bobette Orgill prior to the first day of school to review the handbook together.  Although Plaintiff informed Ms. LaLanne of her expectations regarding behavior in the classroom, Plaintiff had no authority to apply corrective measures such as evaluations or other disciplinary measures to Ms. LaLanne.

4.7     During September 2016, Plaintiff experienced Ms. LaLanne's opposition to her para-student boundary expectations.  Ms. LaLanne had open and inappropriate physical contact with students and also brought gifts for students she favored, contrary to classroom and BSD policy.  Plaintiff was increasingly disturbed by Ms. LaLanne's obsessiveness with three male students in particular, and recognized Ms. LaLanne's behavior as consistent with the grooming patterns of sexual predators. This was highly concerning to Plaintiff because the students being groomed were largely non-verbal and vulnerable and exhibited sexualized behaviors.

4.8     On or about September 9, 2016, Ms. LaLanne purchased and installed a 'privacy curtain' in the sensory room.  Shortly thereafter, student AP was found masturbating in the sensory room.  Ms. LaLanne stated that this behavior was not new and that AP needed to masturbate in order to calm himself.  Plaintiff sent an email to paraprofessionals Ms. LaLanne and Ms. Orgill stating that the privacy curtain must come down.  Pursuant to Ms. Shipp's instructions, Plaintiff called Child Protective Services ('CPS') about AP's masturbation in the classroom as well as student JM's sexualized, violent and predatory behaviors.  BSD took no other action.

4.9     During September 2016, student JM exhibited sexualized, violent, predatory behavior whereby he would select, stalk, and make gestures towards female classmates whom he would physically attack if his advances were met with opposition.  On one occasion, when

COMPLAINT AND JURY DEMAND - 4

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

Plaintiff was absent, student JM injured a female classmate on the playground by throwing her off of the top of a big toy.  Classroom policy was that these two students were never to be together due to JM's predatory sexualized behavior towards her, but Ms. LaLanne indicated that she had been talking to someone on the other side of the fence with her back to the students when this occurred.  Plaintiff stated to Ms. Stone and Ms. Sullivan-Dudzic that Ms. LaLanne was failing in her duty to provide basic supervisory services to the students which resulted in a student being injured and sexually harassed by another student, however BSD took no other action.

4.10    On or about September 30, 2016, Plaintiff discovered Ms. LaLanne laying down in the seclusion room with student JM.  At that time, Ms. LaLanne was morbidly obese and it was physically impossible for her to lay down in that small space with a student without having full physical contact.  Plaintiff reported this violation to Ms. Stone the same day.  Ms. Stone responded via text message, 'Sadly I cannot get the image of a staff person cozying up to a student in a dark area out of my mind.  Yuk!' with 'heart' emojis at the end of the message.  However, to Plaintiff's knowledge, BSD took no action about this clear boundary violation with a vulnerable student.  Later, Ms. Stone directed Plaintiff not to include her text when BSD asked for Plaintiff's records.

4.11    On or about October 5, 2016, Plaintiff spoke with Elizabeth Roberson, resource room teacher, who stated that student JM had sexualized behaviors from the year prior including touching another student's genitals.  BSD took no action in response to these behaviors.

4.12    On or about October 11, 2016, Ms. LaLanne stated with Ms. Shipp present during a meeting with student JM's parent that although she knew she was not supposed to hug JM she felt he 'needed it'.  Ms. Shipp initiated a no hug policy after observing Ms. LaLanne hugging children deep into her breasts, yet took no action regarding Ms. LaLanne's admission other than to instruct Plaintiff to ban her from future meetings regarding JM.  Shortly thereafter, Ms. LaLanne hugged another student because, she said, it calmed him down and, a

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

few days later, hugged JM again. Ms. LaLanne was observed by several BSD employees routinely squishing children up against the wall with her backside.   Plaintiff reported these infractions to Ms. Stone, who took no action.

4.13     On or about November 13, 2016, Plaintiff met with Linda Sullivan-Dudzic to express her concerns about Ms. LaLanne's inappropriate behavior and to request that Ms. LaLanne be disciplined for that as well as her failure to provide basic supervisory care of students which had at times resulted in injury and/or sexual harassment of other students, however no corrective action was taken.

4.14     On or about November 23, 2016, Plaintiff witnessed Ms. LaLanne cuddling on a beanbag chair with student IM.  While Plaintiff reported this boundary violation to Ms. Stone, no corrective action was taken.

4.15     During December, 2016, Plaintiff witnessed Ms. LaLanne giving individual gifts to students despite explicit directives not to from Plaintiff as outlined by Ms. Stone.  Plaintiff reported this boundary violation to Ms. Stone, however no corrective action was taken.  Also during this period Ms. LaLanne posted a picture of herself inside a student restroom on Facebook, although staff restrooms were available to all employees.

4.16     During December, 2016, Plaintiff witnessed Ms. LaLanne with student AP sitting between her legs at an assembly and running her hands through the student's hair. Although this behavior was observed by the entire school in attendance, no corrective action was taken.

4.17     During February, 2017, Plaintiff returned to school early from a professional development day and found Ms. LaLanne laying down alone with a student in the seclusion room in the dark.  Plaintiff reported this boundary violation, however no corrective action was taken.

4.18     On February 13, 2017, Plaintiff met with Ms. Kennedy, Ms. Stone and Ms. Shipp regarding Ms. LaLanne's inappropriate conduct and sexual harassment of disabled students in her classroom.  Plaintiff reported to Ms. Kennedy that Ms. LaLanne's inappropriate

COMPLAINT AND JURY DEMAND - 6

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

behavior with disabled students had been occurring well before she began teaching at KLE and she questioned why nothing had been done to address her boundary violations.  Finally, an investigation into Ms. LaLanne's behavior was begun and she was placed on administrative leave following the meeting.  Ms. Kennedy contacted BSD legal counsel and made CPS reports but directed Ms. Stone and Plaintiff *not* to contact CPS.

4.19    On or about February 23, 2017, Mr. Steedman and Ms. Kennedy interviewed Plaintiff regarding Ms. LaLanne's boundary violations.  In preparation for this meeting, Plaintiff created a document outlining a chronology of events, which Ms. Stone previewed.

4.20     Ms. Stone directed Plaintiff to not include Ms. Stone's text message that read: 'Sadly I cannot get the image of a staff person cozying up to a student in a dark area out of my mind. Yuk!'(Heart, heart emojis). Plaintiff was uncomfortable leaving this out because it showed Ms. Stone's complete lack of understanding of the situation, but she complied since it was a directive from her supervisor.

4.21    During late February, early March, 2017, Ms. Shipp informed Plaintiff that Ms. LaLanne would be returning to work in her classroom.  Plaintiff expressed her frustration with how difficult it was to do her job and supervise Ms. LaLanne at the same time.  Ms. Shipp told Plaintiff that she needed to 'document, document, document' as this was how she got rid of Ms. Patterson--which 'no one thought she could do.'

4.22    During March, 2017, Ms. LaLanne returned to Plaintiff's classroom.  Ms. Stone informed Plaintiff that Mr. Steedman had been anxious to get Ms. LaLanne back from her 'paid vacation.' After Ms. LaLanne returned, she was even more resistant to Plaintiff's direction and even began recruiting other paraprofessionals to align against Plaintiff.  Ms. Stone made Plaintiff aware of a multitude of complaints by Ms. LaLanne against Plaintiff and Ms. Stone. Although Ms. LaLanne's letter of reprimand explicitly stated that 'retaliation against any complainant(s)...would result in disciplinary action, up to and including termination,' BSD took no action to protect Plaintiff from this explicit retaliation.  Additionally, although Ms. LaLanne's letter of reprimand also stated that failure to follow/comply with directives given by

COMPLAINT AND JURY DEMAND - 7

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

1   the certificated teacher (Plaintiff) would 'result in disciplinary action, up to and including
2   termination,' BSD took no action against Ms. LaLanne to enforce this requirement.

3       4.23    During April, 2017, Plaintiff was informed that student GC would be
4   transferring to KLE from Harbor Heights Elementary in Peninsula School District at the
5   beginning of May.  The stakeholders at KLE were concerned after reading his IEP, which
6   documented daily extreme, violent and dangerous behaviors.  Plaintiff was granted a
7   professional day to observe student GC at his current school and interview his special education
8   teacher, Kristen Chu.

9       During her visit to Harbor Heights Elementary, Plaintiff observed student GC and later
10  sent out her observational data along with interview notes of Ms. Chu to all KLE stakeholders,
11  including Ms. Shipp, Ellen Strong (speech therapist), Ms. Stone, Melanie Bond (occupational
12  therapist), Britney McNeal (School Psychologist), and the student's assigned general education
13  teacher.

14      Plaintiff reported that GC exhibited two types of violent behaviors: those that you could
15  see coming, and possibly intercept or at least plan for, and those that had no antecedent, and
16  would occur without any warning.  Ms. Chu elaborated that during the no antecedent behaviors
17  the student did not appear to 'be there' -- you can just see it in his eyes that he isn't there.  Ms.
18  Chu further stated that he had caused significant injury to staff members during these episodes,
19  including broken noses.  Data from GC's IEP showed that he averaged 5 hits per day, 2 kicks
20  per day, 1 head butt per day, 2.5 thrashings per day, and 2.5 floppings per day.

21      4.24    During April, 2017, Ms. Stone told Plaintiff that she had spoken with the
22  principal at Harbor Heights Elementary regarding student GC.  Per Ms. Stone, the principal
23  informed her that despite assigning to him the most tenured and skilled para-educator and
24  teacher, student GC remained one of their most violent and dangerous students.

25      Plaintiff then had a phone conversation with Ms. Shipp expressing her concerns about
26  the seriousness of student GC's behavior, explaining that Harbor Heights had an elaborate
27  system in place for student GC, including a padded isolation room situated right next to his

COMPLAINT AND JURY DEMAND - 8

desk.  BSD made no attempt to replicate Harbor Heights system.  In fact, Ms. Shipp told Plaintiff that she thought student GC's behavior was the result of the student being placed in holds and that Ms. Chu used 'outdated methodology'.

4.25    On or about April 20, 2017, Ms. LaLanne inserted herself into a toileting issue without being asked.  Student AP was potty trained and fully capable of addressing any toileting issues and Ms. LaLanne's conduct was a clear boundary violation, and assaultive to the child's dignity and in violation of policy. Though this incident was directly witnessed by Ms. Stone, she took no corrective action.

4.26    On or about April 27, 2017, a police report was filed by the parents of student SW who was attacked by another student during which time Ms. LaLanne failed to provide basic supervisory care of the students.

4.27    On or about April 28, 2017, Ms. LaLanne was asked to come to the BSD 'district office' following the end of the school day to discuss student SW injuries.  Ms. Stone sent an email to Mr. Steedman stating 'full para pow wow in our staff room before person [TL] left for DO.' Mr. Steedman replied, 'why was that allowed?' The paraeducatorunion at KLE was a united force, even when it was known that a member was not acting in the best interest of students.  Ms. LaLanne openly appeared to be closely aligned to district union representative and paraeducatorat KLE, Ed Anglebeck.  During this period Ms. LaLanne was yet again placed on administrative leave while an investigation was conducted.  Also at this time, Plaintiff applied for a position in another district and obtained recommendation letters from Ms. Stone, Mandy Goodman, OSPI new teacher mentor, and Ms. Shipp.  Plaintiff was given high praise for her professionalism and abilities as a teacher.

4.28    During May, 2017, Student GC enrolled at KLE in Plaintiff's classroom. Per his IEP, GC required 1740 weekly minutes from a paraeducator (also referred to as 1:1 paraeducator).  Ms. Sanders, a transitional paraeducatorfor the BSD, was assigned to work with student GC.  Ms. Sanders held a teaching certificate from the state of Georgia, had previously worked as an educator, and held a Master's Degree.  Ms. Sanders had also demonstrated her

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

proficiency with difficult students when first working with student JM. Despite the wealth of experience and knowledge that Ms. Sanders had, student GC still demonstrated violent and dangerous behaviors, and required several Pro-Act holds within the few weeks he came in before the end of the school year.

During the last 'hold' on student GC, Ms. Stone intercepted Ms. Sanders and Ms. Orgill and told them they could not place him in a hold.  This was highly disturbing as student GC was apt to strike out without warning and with no time to 'de-escalate' him, nor escape and evade.  Thus, the 'no holds' policy would prevent teachers from defending themselves or other students from unpredictable and extremely violent behavior.

4.29    On May 11, 2017, Plaintiff and four paraprofessionals (Ms. Orgill, Ms. Palomino, Ms. Myers and Ms. Sanders) were trained / re-trained in Pro-ACT. Neither Ms. LaLanne nor Ms. Stone attended the training.  Pro-ACT emphasizes prevention and de-escalation strategies, and the use of holds only as a very last resort to be performed with a minimum of two trained people.  But Ms. Shipp and Ms. Stone consistently stated that the BSD was a 'hands-off' district.  Plaintiff was never given consistent policy guidelines on holds. One person holds were not allowed.

4.30    On or about May 9, 2017, Ms. Stone emailed Ms. Shipp and Ms. Sullivan-Dudzic about student GC who she stated 'was very elevated and acting out physically towards classroom and para's. He is very strong and wirey.'

4.31    On or about May 15, 2017,  Ms. LaLanne filed a grievance against Plaintiff which was later dismissed.

4.32    On or about May 17, 2017, Mr. Steedman informed Ms. LaLanne in her letter of reprimand that 'restraint/force should not be used unless there is imminent likelihood of serious harm.'  In addition to the statement that the BSD was a 'hands off district' this was the common statement given to educational professionals regarding the use of holds.  However, Ms. Stone openly criticized Plaintiff to her supervisors and colleagues for not placing holds when there was no imminent likelihood of serious harm, and at other times for refusing to put

COMPLAINT AND JURY DEMAND - 10

student GC in a hold when he was a clear danger.  Yet, Ms. Stone placed students in holds in violation of her own directives.

4.33   On or about May 18, 2017, Ms. Stone and Ms. Kennedy interviewed Plaintiff regarding Ms. LaLanne's grievance against her.  Prior to this interview, Ms. Stone called Plaintiff into her office and showed her a document from Ms. LaLanne which outlined a series of complaints against her.  Ms. Stone attempted to coach her on the 'appropriate answers' to the questions.  Plaintiff became uncomfortable, refused to continue, and told Ms. Stone that she did not have to be coached to tell the truth.

4.34   On or about May 23, 2017, Ms. LaLanne returned from administrative leave to Plaintiff's classroom.  During this period, Ms. Stone repeatedly told Plaintiff that the district was afraid of Mr. Angelbeck because as the para union president he was known to file a lot of unsubstantiated grievances, which is why Ms. LaLanne only received a letter of reprimand the first time she was placed on leave, and only a three day suspension the second time.  Ms. Stone also communicated to Plaintiff that she was afraid of retaliation within her building, and that Mr. Anglebeck already visited her office on a nearly daily basis to inform her of the many violations she had committed.

Upon her return from administrative leave, Ms. LaLanne's behavior toward Plaintiff was retaliatory in nature.  She was openly defiant and continued to disregard basic instructions.  Ms. LaLanne took profuse notes (which she was directed not to do) in lieu of providing supervisory duties as outlined by her job description.  Plaintiff complained of Ms. LaLanne's retaliation against her to Ms. Stone and Ms. Shipp multiple times, however no corrective action was taken.

Plaintiff expressed to Ms. Stone and Ms. Shipp her frustration that she was left to do someone else's job--meaning that at best, the issues with Ms. LaLanne should have been taken care of by Ms. Shipp prior to her arrival as the teacher, and at least, by Ms. Stone as she was informed of the continuing concerns, however no action was taken.

COMPLAINT AND JURY DEMAND - 11

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

4.35   It became clear that Ms. Stone was aggravated with Plaintiff for making waves with the paraeducatorunion and also for exposing Ms. Stone's incompetence to her supervisors. Ms. Stone admitted to Plaintiff that 'Garth is mad at me for not addressing the Tammy problem sooner or we could have fired her,' and that Ms. Stone had received a negative evaluation because of how she handled the situation with Ms. LaLanne and the ISP.  Ms. Shipp told Plaintiff that Mr. Steedman had confronted her regarding her inaction when she saw Ms. LaLanne dragging a student down the hallway by his legs the previous school year.

4.36   Near the end of May, 2017, Debra Strawhun, early childhood coordinator and special education regulatory guidance for the BSD, called Plaintiff regarding bullying by paraprofessionals.  Ms. Strawhun, she had been informed by Ms. Shipp that Plaintiff was being bullied by one or more of the paraprofessionals working in her classroom.  Plaintiff had contacted her union representatives regarding the bullying.  Shortly thereafter, Ms. Stone confronted Plaintiff regarding contacting her union representative.  Per Ms. Stone, someone had called Ms. Stone and told her that Plaintiff was 'talking.'

During that period, Ms. Shipp and Ms. Stone retaliated against Plaintiff by pulling away staff support.  Ms. Shipp's secretary, Donna McCoy began calling to cancel appointments, and both Ms. Shipp and Ms. Stone stopped responding to text messages and phone calls from Plaintiff.  At the same time, there was an increased focus on what Plaintiff was perceived to be doing wrong.  Ms. Stone no longer came to Plaintiff directly to discuss issues in an exchange of ideas, yet she repeatedly asked Plaintiff questions about things that had already been asked and answered and was hypercritical of Plaintiff.  Despite this, Plaintiff continued to bring safety, boundary and personnel issues to Ms. Stone regarding Ms. LaLanne, as well as her concern that Ms. LaLanne was retaliating against her. However, no corrective action was taken to protect students or Plaintiff.

4.37  On or about June 1, 2017, Plaintiff again met with Ms. Stone regarding Ms. LaLanne's bullying of her, and being disrespectful and unsafe around children.  Ms. Stone teleconferenced with Ms. Kennedy and Plaintiff regarding the issue of bullying/retaliation.  Ms.

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

Kennedy directed Ms. Stone to provide Plaintiff with the procedures for filing a grievance that are found in the 'investigation binder and staff to staff complaint.'  Though Ms. Stone later stated to Ms. Kennedy in an email that she had given Plaintiff the appropriate paperwork prior to the teleconference, she in fact had not done so.  Following the initial teleconference, Ms. Stone claimed to Plaintiff that she did not know what paperwork Ms. Kennedy was talking about.  Plaintiff continued to ask Ms. Stone about the paperwork and procedures for filing a complaint.  Ms. Stone clearly stalled in providing Plaintiff with the appropriate information to file a complaint, as there is a short time limitation for filing such complaints

4.38    On June 6, 2017, Plaintiff texted Ms. Stone asking about filing a complaint.  Ms. Stone did not respond.

4.39    On June 7, 2017, Plaintiff emailed Ms. Stone regarding filing a complaint.  Ms. Stone replied (and bcc'd Ms. Shipp) that she will 'place a copy of the policy in your box.'

4.40     On or about June 8, 2017, Plaintiff received the requested paperwork in her staff box and visited Ms. Stone in her office to get questions answered regarding it.  At that time, Ms. Stone discouraged Plaintiff from filing any complaints against Ms. LaLanne and/or Mr. Anglebeck.

4.41    Near the end of the school year, 2017. Ms. Sanders, paraeducator who was assigned 1:1 with GC, was replaced with substitute paraeducator Bonnie Myers.  Ms. Myers was told by Ms. Stone that she could not place student GC in a hold, which she thought was very unsafe given his violent and unpredictable outbursts.  None of the paraprofessionals wanted to work with student GC, especially given their inability to use restraints

4.42    On or about June 15, 2017, Ms. Stone sent an email to Ms. Shipp, Ms. Sullivan-Dudzic and Plaintiff regarding an appropriate placement for student GC for the upcoming school year, stating that 'we have a couple of younger students joining us from NA (Naval Avenue) so I want to advocate for GC to be in the most appropriate placement to support his frequent, strong, and highly agitated physical outbursts directed at staff and peers.'

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

4.43    On or about June 16, 2017, Ms. Myers was hit by student GC and sustained a concussion.  Ms. Myers did not return to BSD because of student GC and the lack of support from administration.  Ms. Myers still cannot work with severely autistic children because of the trauma of that attack.  She filed a workers compensation claim.  Plaintiff was never informed of the serious nature of the assault and subsequent injury.

On or shortly after the last day of school, Danielle Palomino (ISP paraeducator at KLE, cousin of Ms. LaLanne, and personal friend of Ms. Stone) informed Plaintiff that Ms. LaLanne had tried to recruit her to go to the district office and file a group complaint against her.  Per Ms. Palomino, Mr. Anglebeck and Ms. LaLanne were 'recruiting' other paraprofessionals to go with them.

Following the last day of school, 2017, Ms. Stone refused to sign off on Plaintiff's classroom until she pulled every staple out of her classroom walls.  This was not something that was required of any of her co-workers.  In fact, many co-workers left their rooms completely intact at the end of the school year.

4.44    During the summer months of 2017 Ms. Shipp and Ms. Stone continued to go around Plaintiff instead of working directly with her.  Ms. Williams told Plaintiff that Ms. Shipp had told her to tell Plaintiff to 'manage her paras.'  Ms. Williams also told Plaintiff that Ms. Stone had approached her at summer institute and asked her to 'help Plaintiff.' *Note: Ms. Williams had previously been asked to 'help' another special education teacher in the district who ended up being terminated mid-school year.

Just prior to the start of school, Plaintiff was at KLE at the same time as Ms. Stone. Ms. Stone told Plaintiff that she gave her 'too generous' of an evaluation. Ms. Stone also asked Plaintiff what they were going to do with student GC for the upcoming school year.  Ms. Stone then called Ms. Shipp, and the three of them teleconferenced.  During this teleconference, Ms. Shipp stated that no paraeducator would be provided for student GC for the upcoming school year.  This was a direct violation of student GC's IEP.  Ms. Shipp said among other excuses, that he may have 'matured' over the summer and we need to evaluate the need first.

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

4.45    From late August through September 2017, Ms. Stone's demeanor towards Plaintiff became more negative, and at times, hostile.  Ms. Stone would stand in the door with arms crossed as Plaintiff taught, raise her voice and change her demeanor when talking to Plaintiff in the presence of other staff members, radio information about Plaintiff over the all building system that were non-issues, and routinely and loudly point out things that she didn't like in the ISP room in front of students and staff.  Ms. Stone told Plaintiff repeatedly that she had 'too many bodies' in her room already whenever Plaintiff sought paraeducatorhelp for student GC.  Ms. Stone routinely texted, videotaped or took pictures of Plaintiff and student GC when he was exhibiting dangerous and/or violent behaviors instead of helping to protect this student and Plaintiff.  Ms. Stone also appeared to have formed a strong alignment with Ms. LaLanne: So much so that Ms. LaLanne felt comfortable enough to suggest to Ms. Stone that a seasoned teacher be sought to replace Plaintiff.  Ms. LaLanne posted a picture of herself and Ms. Stone on her personal Facebook page.

Furthermore, a trend emerged whereby Plaintiff was not informed of, nor invited to attend meetings or give input regarding her volatile student GC.  Ms. Shipp, Ms. Stone, Larry Davis, Behavioral Specialist for the BSD, Ms. Strong, and Ms. Sullivan-Dudzic held formal and informal meetings, and/or made decisions regarding student GC without informing his teacher, Plaintiff.  These individuals also gave Plaintiff  multiple conflicting directives that violated students' IEPs, Pro-ACT principles, and served as a vehicle by which a chaotic, unsafe and traumatic environment was created for Plaintiff, student GC, and many others, all in retaliation for Plaintiff's protected behavior challenging the sexual harassment of students by Ms. LaLanne.

As Plaintiff increasingly reached out to her union for help, she was faced with increased retaliation from Ms. Stone and district officials, up to and including being locked in a room alone with a known violent student.

4.46    On or about September 5, 2017, student GC exhibited multiple incidences of aggression, elopement, destructive behaviors, and violence towards other students, Plaintiff,

COMPLAINT AND JURY DEMAND - 15

1  and other staff members--including an assault of Ms. Orgill whereby he ran towards her, began

2  hitting her, pulling on clothing and glasses.  No antecedent was evidenced prior to this assault

3  which was therefore unavoidable.  Plaintiff contacted student GC's mother via phone (3:25pm)

4  who said that he has an 'instant flip-switch, but doesn't know why it happens.'  Plaintiff

5  reported this to Ms. Stone, but no action was taken by BSD.

6      4.47    On or about September 6, 2017, first thing in the morning Plaintiff was informed

7  by Ms. Stone that Ms. Shipp 'has agreed to provide substitute staffing' to have a 1:1

8  paraeducator work with GC.

9      At around 2:00 p.m., student GC, without any antecedent, screamed and leapt onto

10 Plaintiff face forward, wrapped his legs around her waist and punched Plaintiff multiple times

11 in the face, mouth, temple and body with closed fists.  During this unexpected assault, student

12 GC kicked Plaintiff multiple times, shoved her against the door, and broke her glasses with a

13 blow to the head.  Plaintiff was trembling, disoriented, fearful, and shocked by the attack.

14 Plaintiff sought medical treatment and filed a workers compensation claim.  Student GC was

15 suspended following the assault.  From this date on, Plaintiff was on edge, and greatly

16 concerned about her own safety as well as others in the school community.  Plaintiff reported

17 the incident to Ms. Stone who responded, 'did you use your Pro-ACT evasion?'  Plaintiff

18 responded, 'I didn't have time to think about that as I was being pummeled by the kid.'  Even

19 after this assault, Ms. Stone and BSD failed to provide Plaintiff with any training or

20 paraeducatorsupport to protect herself from extreme, unexpected, violent attacks such as these.

21 Ms. Stone further stated that she had told Ms. Shipp the day before that 'we needed to do

22 something before someone got really hurt, and look what happened.'

23     4.48    On or about September 7, 2017, Plaintiff met with Ms. Stone and Mr. Davis to

24 discuss the assault by student GC the previous day, and to institute a Functional Behavioral

25 Analysis (FBA) plan to address GC's violent outbursts.  It is to be noted that if it were an FBA

26 meeting, all the stakeholders would be present and nearly all were missing. Furthermore, no

27 consent had been sent home to student GC's parents, which is a requirement to begin an FBA.

COMPLAINT AND JURY DEMAND - 16

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

Mr. Davis said he was acting on behalf of Ms. Shipp and that no 'staffing' would be provided for Plaintiff.  This was a clear violation of the student's IEP and, in addition to Plaintiff, put other students and staff at risk.  Plaintiff reiterated her serious concerns regarding student GC's violent outbursts, especially the ones without antecedent or warning, such as the one on September 6th.  Plaintiff reminded those present as to what student GC's prior teacher had said about his violent behavior, and that he had broken people's noses.

Plaintiff also emphasized several times that student GC had targeted a very small student (OS) with extremely low cognitive functioning.  Plaintiff was frightened that without staffing support, that all of the students were at serious risk.  In response, Mr. Davis told Plaintiff to contact her union representative.

At the end of the meeting after Mr. Davis left, another teacher came in for a previously scheduled meeting.  Ms. Stone said that Mr. Davis is 'a fucker' and that he doesn't like her (Ms. Stone)  because she 'ratted him out' to Ms. Shipp.

Plaintiff asked Ms. Stone for an additional two-day suspension so she might put safety measures in place to protect students and staff from unexpected attacks from student GC.  Ms. Stone informed Plaintiff that would not happen.  Plaintiff spent her weekend modifying the current schedule in order to minimize the possibility that student GC would have the opportunity to assault one of her other students.

4.49    On or about September 8, 2017, Ms. Shipp stated in an email to Sherri White, program supervisor for special education at OSPI, 'in our district we do not develop Emergency Response Protocols (ERP) until the data from the behavior intervention plan (BIP) has been collected and determined that restraint or isolation is required. In the past, they have been used as an 'excuse' to restrain or isolate students and we are working hard at changing the culture of our district with being 'Hands off' and implementing the Pro-ACT tenants [sic].'

4.50    On or about September 9, 2017, Mr. Davis inadvertently sent an email to Plaintiff asking her to call him, when in fact, he thought he was messaging Ms. Shipp. When Plaintiff called him, he began to reference their discussion about Plaintiff from the day before,

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

and how he just doesn't think she (Plaintiff) has the 'tools in her toolkit to do her job.' Plaintiff had only received stellar reviews from her supervisors up to this point, and no concerns about her performance were provided her by either of them. Plaintiff had still not received the training and support required by Washington Administrative Code 181-79A-231 from BSD.

4.51    On or about September 10, 2017, Ms. Stone shared a video to all KLE staff narrated by Ms. Stone, and posted on YouTube. Ms. Stone's video showed Teri Beliveau, safety officer and clerical assistant at KLE, and Fire Captain Dan Mustard demonstrating how a small piece of 2 1/2 inch firehose when applied to a school door's hinge 'is going to improve safety for staff and students.' This device was purportedly intended to prevent an active shooter from entering classrooms. BSD had recently required staff to go through a web based training on ALICE, an active shooter response procedure. The modified firehoses were provided to every classroom at KLE and at least to one other elementary school, Crown Hill. During the fall of 2017, the firehoses were used not for active shooters, but for eloping special education students. Ms. Stone would radio 'doors' and every staff person was to place the firehose on the door hinge, including the main doors to the outside. This created multiple problems of inadvertently trapping students and staff on the wrong side of the classroom and exterior doors.

However, Plaintiff's classroom door hinge was on the *exterior* of her classroom making the firehose application for active shooters not only pointless but dangerous as she would have no control over the door from the inside. Ms. Stone would later use this device in an escalation of BSD retaliation to imprison Plaintiff alone with the extremely volatile, unpredictable and violent student GC. Furthermore, Ms. Stone's video clearly shows that when one attempts to open the door with the fire hose on, it opens a small gap that closes quickly on itself when released. Student GC sustained two injuries as a result of this spring loaded action after Ms. Stone applied the firehose to Plaintiff's classroom door against her will.

4.52    On the morning of September 11, 2017, Ms. Stone and Ms. Shipp met privately before student GC's re-entry meeting and Plaintiff was not invited to attend. At 8:30 in the morning student GC assaulted Plaintiff with a cafeteria tray to her head, and proceeded to

COMPLAINT AND JURY DEMAND - 18

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

scream and disrobe in the cafeteria.  Immediately following this, Ms Shipp implemented a directive whereby ALL STUDENTS on Plaintiff's caseload must now be in the ISP (special education classroom) for the entire school day until further notice; even those who had been spending the majority of their time in the general education setting for years.  All students, despite what their IEP mandated, were now to eat breakfast and lunch with Plaintiff.  All students, despite what their IEP mandated, would not attend general education recess, nor general education specialists.  Ms. Shipp and all of Plaintiff's supervisors were aware that this was a direct violation of all students' IEP, their constitutional rights, and would undoubtedly create a chaotic and unsafe environment for both students and staff.

Plaintiff expressed those precise concerns to Ms. Shipp, as well as her concern that they would be putting a large group of kids into a small space with a student who is volatile. Plaintiff had just been given permission by Ms. Stone to change the schedule to minimize contact between this student and others in the hopes of decreasing the probability that someone would be injured during one of student GC's rages.  Ms. Shipp told Plaintiff that all the ISP classrooms in the district were doing the same thing, which Plaintiff knew to be untrue, and was demonstrably false given that the whole district would be violating nearly all students' IEPs.

As directed, Plaintiff changed the schedule to reflect Ms. Shipp's directives. The classroom immediately became chaotic as students and paraeducator schedules all changed within minutes.  Plaintiff had no time to plan for this sudden schedule change. Students who were pulled from their general education setting were understandably frustrated and confused. The students who spent the majority of their time in the ISP, including student GC, were the students most impacted by the sudden change in routine.  The sudden influx of students and the significant change to their schedule caused the students incredible and undo stress, as their ensuing behavior reflected.  Following this ridiculous change to programming, Mr. Davis made his first official visit to Plaintiff's classroom to observe student GC.  The sudden, disruptive scheduling change just before Mr. Davis came to observe was an intentional act of retaliation

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

made to make Plaintiff appear incompetent and to cause her embarrassment and threaten her employment status.  At the end of the school day, Plaintiff asked Ms. Stone if she had to continue with this new schedule.  She was told that Ms. Shipp was her supervisor and that it was a directive to be followed.  Plaintiff responded emphatically that her students would be put in harm's way.  Nonetheless, she complied.  That evening, Plaintiff was told by a fellow ISP colleague Ms. Williams that Mr. Davis was discussing Plaintiff with other teachers.

4.53    On or about September 11, 2017, Plaintiff met with building union representative Bri Baker regarding her concern for student and staff safety, as well as her belief that she was being retaliated against.

4.54    On or about September 12, 2017, Plaintiff met with Ms. Stone in the morning to go over the new schedule.  Plaintiff expressed her concern and frustration that her students were being denied their right to attend general education.  Plaintiff further stated that if changes were going to be made to the students' time in general education that the parents would need to be notified, however parents were never notified and Plaintiff continued to follow the directives of her supervisors.  Student GC had several instances of aggression, and Plaintiff was punched in the face during one of his rages.

Around 2:30 that afternoon Ms. Sullivan-Dudzic arrived in the library and asked Plaintiff where the meeting was.  Plaintiff did not know of a meeting.  Ms. Sullivan-Dudzic said she was meeting with Mr. Davis to discuss student GC and she was there on behalf of Ms. Shipp.  Though Plaintiff was not invited to attend the meeting, she inserted herself into the meeting only to find out that they were discussing her.

Following the meeting, Plaintiff expressed her concern to Ms. Sullivan-Dudzic that there were too many cooks in the kitchen.  Mr. Davis was advising/directing not to 'push' student GC to follow a schedule; while Ms. Sullivan-Dudzic directed the opposite, stating that student GC should be given a schedule which is controlled by the supervising adult, while Ms. Stone's directive was for Plaintiff to have student GC awake at all times (despite the information on his IEP and/or the information gained from Ms. Chu and given to all

COMPLAINT AND JURY DEMAND - 20

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

1  stakeholders), and engaged in more academic activities.  Plaintiff could not possibly comply

2  with so many conflicting directives; many of which were not in keeping with the students

3  current IEP, nor in his best interest.

4      Plaintiff met with Ms. Stone at the end of the day to again explain why putting all the

5  students in her classroom for the entire day was not working and was in clear violation of all

6  their IEP's.  Plaintiff expressed her frustration that she was being set up to fail, and that

7  someone was on a fault-finding mission.  Plaintiff stated to Ms. Stone, 'to have someone

8  observing, who already had preconceived ideas about her, at the same time that her

9  programming had been suddenly changed, felt like a set-up.'  She expressed concern that this

10  plan was not in alignment with best practice for her students, but it also felt like someone was

11  trying to push her out of her job.  Plaintiff also expressed concern that information gained for

12  the FBA would not be accurate due to the sudden changes in programming.

13      Ms. Stone left Plaintiff a phone message that evening telling her that the students would

14  no longer be held back from attending their general education classes.  Around 4:01 p.m., Ms.

15  Sullivan-Dudzic emailed Plaintiff stating 'if we have a tight plan and it is working, we might

16  then consider a temporary resource to help him learn it (maybe 10 days).'

17      4.55    On or about September 13, 2017, Plaintiff met with Ms. Stone to go over the

18  schedule which changed again. Ms. Stone told Plaintiff that 'she is giving her the autonomy as

19  the teacher to do her schedule, but that she is not to tell Larry (Davis) that 'Susan said I could.'

20  Plaintiff felt as if she was living with two dysfunctional, divorced parents.

21      Ms. Stone told Plaintiff that Ms. Palomino, a paraeducator, had come to her because she

22  was tired and frustrated. Ms. Stone decided that the ISP paraprofessionals should have the

23  opportunity to do the 'fun' stuff while Plaintiff would now be the first responder to all

24  incidences of violence/aggression.  Plaintiff complied with the directive of her supervisor--

25  which in effect placed her in the position of a paraeducator, and required the paraeducators to

26  do the work of the teacher. This was another escalation of the retaliation against Plaintiff for

27

COMPLAINT AND JURY DEMAND - 21

her attempt to protect the male students from Ms. LaLanne's depraved behavior, and also for exposing Ms. Stone's incompetence as a supervisor.

4.56    On September 14, 2017, at approximately 2:45 in the afternoon, Ms. LaLanne was assaulted by student GC.  GC flipped over a computer, then punched her in the face and body.  Ms. LaLanne stated that her back was to him when the incident began and there was no known antecedent.  At around 3:00 that day, Plaintiff reported the assault to Ms. Stone and asked again about getting the necessary support to help with the violent student.  Ms. Stone responded by essentially blaming Plaintiff for GC's assault on Ms. LaLanne, even though Plaintiff had fully implemented Ms. Stone's plan as directed.  Furthermore, when Plaintiff again asked about student GC getting the 1:1 support that was outlined in his IEP, Ms. Stone stated that Plaintiff 'had too many adults in the room already.'  Later that day Plaintiff and Ms. Baker met with district union representative Gregory Raymond to discuss the retaliation and lack of support.

4.57    On or about September 18th, 2017, Plaintiff was again assaulted by student GC, which included closed fist punches to her face, body and back causing great fear and physical and emotional pain and suffering.  Plaintiff emailed her union representative, Mr. Raymond, that Mr. Davis's plan was not working and that Ms. Stone still has not provided the required 1:1 paraeducatorsupport, which might have prevented the assaults.

4.58    On September 19th, 2017, Plaintiff was again assaulted by student GC, sustaining several closed fist punches to the head and body, causing additional fear, pain and suffering.  Plaintiff again asked Ms. Stone about providing the 1:1 staffing that student GC required per his IEP.  Ms. Stone replied that the pushback from Ms. Shipp will be to provide schedules for this student and another student on Plaintiff's caseload before any support would be provided.  A 'schedule,' however, is not a pre-requisite for a 1:1 paraeducator per GC's IEP.

Plaintiff also expressed concerns regarding Ms. LaLanne's interactions with students to Ms. Stone, who told her 'it will be on the district, not you, if something happens.'  Ultimately,

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

1  this would prove to be accurate, however her reasoning was not acceptable to Plaintiff.

2  Plaintiff repeatedly sought assistance from BSD with an impossible situation in order to

3  prevent further harm to students and staff, but with retaliation as motivation those calls went

4  unanswered.

5      That afternoon at approximately 3:11 p.m., Mr. Raymond informed Plaintiff that he had

6  met with the Superintendent, Aaron Leavall, about her concerns, and told Superintendent

7  Leavall 'to pay close attention specifically to your one particular student because it looks like

8  how the district handles him might change how the entire year goes.'  Plaintiff replied to Mr.

9  Raymond the same day with her frustrations and fears regarding her employment and safety.

10     4.59    On September 21, 2017, Mr. Raymond informed Plaintiff, in response to her

11  stated concerns, that he had again spoke with Superintendent Leavell about her concerns and

12  offered to set up a meeting between them.

13     4.60    On September 22, 2017, Plaintiff emailed Ms. Sullivan-Dudzic (cc'd Ms. Shipp

14  and Ms. Stone) that she had completed the required 'schedule' thereby continuing to attempt to

15  satisfy the latest requirement for Plaintiff and her classroom to receive the IEP required support

16  of a 1:1 paraeducatorthat student GC, Plaintiff, staff and students were legally entitled to.

17     Ms. Stone emailed Ms. Shipp (cc's Plaintiff and Mr. Davis), 'I want to be very clear

18  that, while working very hard and making gains, physical outbursts directed at other students

19  and staff remains an almost daily occurrence.'

20     4.61    On September 24, 2017, Ms. Stone emailed Ms. Shipp, stating 'we have had

21  multiple incidences of this student running out of the building, into and across the parking lot,

22  and up into the woods approaching the road. Mom reports to Wendy this is a concern at home

23  too.'  Plaintiff repeatedly expressed her concern to Ms. Stone that student GC's elopement to

24  the road was potentially hazardous and could be fatal.  When Plaintiff questioned the safety of

25  following the 'hands-off' policy in these instances, she was directed by Ms. Stone to, instead,

26  follow Ms. Strong's re-engagement methods, by offering GC desired activities after he eloped,

27  which in actuality only served to reinforce the student's desire to elope.

COMPLAINT AND JURY DEMAND - 23

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

Though the student had eloped to the road multiple times, Ms. Stone only agreed to put the student in a hold on one occasion, and only because Ms. Stone was needed elsewhere in the building.  Thus, Pro-ACT appeared to serve as a facade for whatever administrators desired it to be.

4.62    On September 24, 2017, Ms. Shipp responded to Plaintiff's September 22nd email that student GC had a schedule, stating, 'Great. I will talk to Donna about putting in for a short term sub.'  After students and staff were subjected to multiple assaults and dangerous behavior over the course of nearly a month, Ms. Shipp stated that she would begin to work on getting a 'short-term' substitute 1:1 paraprofessional.  However, no such help would actually be forthcoming until district officials had to spend nearly an entire whole day caring for this extremely volatile, violent and dangerous student during Plaintiff's absence on October 5th, 2017.

4.63    On September 25, 2017, Student GC battered students and staff, caused an entire class to evacuate, and eloped to the main road on several occasions.  GC also climbed through the second floor railing, which could have caused him serious if not fatal injuries if had he fallen.

After school that day, Ms. Stone asked Plaintiff to attend an IEP meeting with 'the team.'  The 'team' consisted of Ms. Stone and Ms. Strong.  Plaintiff was informed that the 'team' had decided that student GC will spend all his time with *only* Plaintiff *alone* in a room.  Ms. Stone directed Plaintiff to barricade the door with furniture to prevent GC's escape.  Plaintiff attempted to offer other options, and expressed her major concerns with this plan, but she was met with opposition.  Ms. Stone stated that this information had come from Ms. Sullivan-Dudzic at the district office who stated that student GC's 'world needed to be made small.'  Plaintiff and a colleague stayed at work until 8:30 p.m. moving furniture to accommodate this plan.

Ms. Sullivan-Dudzic notes that on September 25th, she 'discussed plan with Susan on how to keep G from running out the front door using a device to slow G down and radio help at

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

the front door.'  The device would be the fire hose planned for deployment in the event of a

shooter.  Plaintiff was not consulted about this and would not have given consent had she been

asked.  Furthermore, Ms. Stone and Ms. Sullivan-Dudzic knew that barring/blocking GC would

cause him to escalate and lash out, and they knew that Plaintiff could not per policy restrain GC

alone.

4.64    On September 26, 2017, at 6:16 a.m., Plaintiff emailed Mr. Raymond telling him

about the plan to barricade her in the room with the violent and volatile GC, Plaintiff did not

know about the planned use of the device yet.  She reminded him that this plan was against

Pro-Act and 'against the information put into the FBA by the district behavioral specialist who

says we should not block doors/escape routes.'  Plaintiff concluded by telling Mr. Raymond

that the plan put her in harms way because he is extremely violent and that the student has

assaulted multiple people and continues to demonstrate very unsafe behavior for himself and

others.   Plaintiff further informed Mr. Raymond that she had spent all of twenty minutes in the

classroom the day before, and the rest of the time was spent following GC to his many places

of escape and having tantrums.

Before the start of school, Plaintiff visited and consulted with fellow special education

teachers Michelle Schmick and Melanie Garrett at Bremerton High School.  She shared her

concerns about being barricaded and, in response, was assured by Ms. Garrett, a Pro-ACT

trainer, that this should not happen and is not in keeping with the Pro-ACT principles.

At about 8:15 a.m., Plaintiff arrived at school and immediately informed Ms. Stone that

she refused to be barricaded in the room with student GC, that she did not want to be left alone

with him, and that this plan is not in alignment with district policies or Pro-ACT.

Plaintiff saw that the phone had been removed from her classroom overnight.  Plaintiff

was not consulted regarding the removal of the phone and would not have agreed.

Furthermore, the only computer in the room was placed in a locked cabinet.  Without access to

a computer or phone, Plaintiff had no way to safely communicate with the office or others in

the event of an emergency.  Additionally, it was commonly known that student GC often stole,

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

1  weaponized and/or destroyed Plaintiff's two-way radio, further disabling her ability to

2  communicate with others when needed.

3      Ms. Strong arrived in the classroom shortly after Plaintiff to get Plaintiff set up with the

4  teaching plan that was devised by Ms. Strong.  At 9:26 a.m., Mr. Raymond emailed Plaintiff

5  back stating that he will try to get some answers for her and that 'I've said to them many times,

6  and will continue to tell them that something horrible is bound to happen and when it does will

7  they be able to say that they handled the situation with adequate and appropriate attention, or

8  will they be on the wrong side of a lawsuit….it seems like the district only wants to react to a

9  situation after it has taken place.'

10      Plaintiff worked with student GC in the morning who began escalating and eloped

11  about 10:00am out the classroom door. GC ran to the front of the building. Ms. Stone and three

12  others, not including Plaintiff, put GC in a hold and carried him back to Plaintiff's classroom.

13  This was in direct violation of BSD's directives to be hands off.  At about 10:30 in the

14  morning, Ms. Stone put the firehose device over the door hinge outside the classroom.  Plaintiff

15  was observing student GC from the kitchen camera when student GC tried to elope through the

16  door and got his hand stuck in the 'spring loaded' gap caused by the firehose, and started

17  screaming.  Plaintiff entered the classroom through the kitchen door which automatically

18  locked behind her, to assist student GC at which point Plaintiff was unable to leave the

19  classroom and was effectively trapped.  Ms. Stone took the firehose off the hinge briefly to let

20  the nurse in, then put it back on when the nurse left, leaving Plaintiff in the room alone with

21  this extremely volatile and violent student.  Plaintiff was not trained in one person holds, nor

22  were they allowed by Pro-ACT because it was too dangerous for one person to do. Neither Ms.

23  Stone nor Plaintiff were trained in how to handle a volatile student one on one.

24      It should be noted that while Plaintiff's classroom exited into a kitchen area that

25  adjoined the two ISP classrooms, the doors on either side of the kitchen area were always

26  locked because of the potential weapons that could be used by students.  Even when Plaintiff

27  did have the keys to the kitchen door, she could not safely turn her back on student GC when he

COMPLAINT AND JURY DEMAND - 26

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

was escalating to open the door because he would assault her from behind.  Plaintiff spent most of the day trapped in the classroom with the student and was *assaulted and battered multiple times and unable to escape*.  No staff member consistently observed or monitored her from outside in the hallway, and nobody could help her.

At one point, Ms. Strong was alone with GC on September 26th and did not have her keys. When GC began screaming and threatening assault, she began pounding on the kitchen door for about 5 minutes until the substitute teacher next door let her out. Ms. Strong was afraid GC would attack her and was visibly upset when she was let out of the room.

That afternoon GC tried to elope through the gap in the door and got his whole body stuck in the gap and was screaming out in pain.  Plaintiff had no keys, no phone and no way of removing the firehose on the exterior of the door.  Plaintiff radioed for help and Ms. Palomino finally arrived.  Ms. Palomino closed the door on the student in order to release the firehose, further injuring student GC.  When the student was released, Ms. Palomino put the firehose back up again.

Ms. Stone later came to check on Plaintiff and Plaintiff told Ms. Stone through the gap in the door that she wants the firehose taken off, that it isn't safe, that she isn't safe.  Ms. Stone briefly took down the firehose, but soon put it back up again.

4.65    In the evening of September 26, 2017, Plaintiff emailed Mr. Raymond to tell him that 'I was locked in a room with this student today even after I expressed my concerns about the safety of myself and the student. I refused to barricade the room and the student started escalating almost immediately after arriving at school.'  Plaintiff complained that she had been assaulted multiple times that day and at one point she did not have her keys to exit through the kitchen and was completely trapped. Plaintiff sent Mr. Raymond a picture of the device.

That same afternoon Ms. Stone, Ms. Strong, Ms. Sullivan-Dudzic and the janitor met to discuss ways to further prevent student GC from eloping.  A decision was made to 'strategically place' Plaintiff's desk, where she sits, in front of the door in order to block his

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

1  exit.  Plaintiff was neither informed of this meeting, nor consulted regarding this 'strategic
2  placement' of her desk.

3       4.66    On September 27, 2017, Plaintiff visited and consulted with Ms. Garrett at
4  Bremerton High School before school started.  Plaintiff shared the events of the previous day
5  with her colleague.  Ms. Garrett reiterated that the plan was against policy.

6       When Plaintiff arrived at KLE she immediately told Ms. Stone that she did not want the
7  firehose to be used, and did not want to be left alone with the student under any circumstances.
8  Plaintiff emphasized that Ms. Stone's plan was not in keeping with Pro-ACT, and that the plan
9  did not sit right with her.  Ms. Stone responded, '[i]n all transparency, Ellen (Ms. Strong) and I
10 showed Linda (Ms. Sullivan-Dudzic) the firehose and she thought it was a great idea.'  Plaintiff
11 responded that she did not and she was the one in the room.  Plaintiff further questioned Ms.
12 Stone as to why there were staff/admin meetings regarding a student on her caseload when she
13 was excluded.

14      Ms. Stone directed Plaintiff's to begin teaching student GC from behind her desk,
15 which had been moved in front of the exit door. This in essence utilized the desk and Plaintiff
16 as a barricade for the door, and prevented Plaintiff from safely exiting.  Ms. Stone was aware
17 that barricading/barring/blocking students would cause them to escalate.  Student GC had
18 begun to demonstrate a clear pattern of scream, assault, escape that happened simultaneously,
19 swiftly and without warning.  Plaintiff felt she had no choice but to comply with the directives
20 of Ms. Stone and she was alone for most of the day with the student, and suffered *multiple*
21 *assaults* as the student would attempt to elope over the desk. Plaintiff could not turn her back
22 on GC to exit without GC attacking her from behind, across the desk so she was effectively
23 trapped in the room with GC again.

24      Immediately following the school day, Plaintiff contacted her union representative, Mr.
25 Raymond and shared her concerns with him.  Mr. Raymond stated that he was going into a
26 meeting with district officials and would share her concerns with them.

27

COMPLAINT AND JURY DEMAND - 28

At 2:30 pm, the BEA union reps including Greg Raymond met with BSD administrators including Superintendent Leavell, Assistant Superintendent Steedman, Denise Kennedy and Ms. Sullivan-Dudzic. One of the topics of discussion was 'violent students.' It was noted that 'staff members are feeling that measures to prevent this from happening again aren't being adequately addressed.  How can we assure teachers / paras that the District is taking their situations seriously?'  Ms. Sullivan-Dudzic stated she was working with a teacher (Plaintiff) to 'create a plan for the student so they can bring in someone to help teach the student the plan.' A 'plan' however, would not address the violence.  The BEA continued to bring their concerns to BSD administrators over the next year about violent students and BSD's lack of response to the point that teachers were fearful to come to work.

4.67    On September 28, 2017, Ms. Sullivan-Dudzic visited the classroom before a 12:00 meeting and observed that 'Susan is outside the door holding and trying to engage with (student GC) while he was violently screaming and crying and climbing on the table that had been strategically placed.' Ms. Sullivan-Dudzic stated to Plaintiff and Ms. Stone that 'no one should be with (student GC) alone and that two people always.'  However, Ms. Stone left Plaintiff shortly thereafter to attend a meeting.  Before departing she asked the neighboring teacher, Veronica Moore, to 'keep a listen' for Plaintiff in case she cries out/shouts for help.

Plaintiff was again alone off and on with student GC and trying to comply with Ms. Stone's instructions to use the desk in front of the exit door.  In the morning, student GC assaulted Plaintiff with closed fist punches to the body, kicked her and scratched her multiple times causing fear, anxiety, and mental and physical pain and suffering.  Plaintiff began taking more detailed notes of the assaults, which demonstrated that the plan that the 'team' (Ms. Strong, Ms. Stone, and Ms. Sullivan-Dudzic) created had only served to aggravate, escalate, and traumatize student GC.  Student GC's incidences of rage had become so significant that April Cummings, 2nd grade teacher at KLE could hear the screaming and pounding on the walls in her classroom, which is located on the other side of the building.

COMPLAINT AND JURY DEMAND - 29

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

This was seen by Plaintiff through the window, and is also documented by Ms. Stone: 'late afternoon, violent slamming continued. Safety device implemented to decrease slam leverage and elopement opportunity.'  Ms. Stone stated in her interview with Bremerton Police, that she took the firehose off because 'GC was destroying the door frame from pulling on the door.' This shows how strong GC was but also that  Ms. Stone was clearly more concerned about the door than with GC's or Plaintiff's safety.

At around 2:00 p.m., GC punched Plaintiff hard in the right jaw.  This assault occurred after a three person hold was directed by Ms. Stone. It is unlikely that Plaintiff would have been injured if a proper four person hold had been done. Right after being hit in the jaw, Plaintiff had a significant episode of crying and hyperventilating. This was a strong reaction for Plaintiff and demonstrated the trauma Plaintiff was experiencing from GC's repeated assaults, some while being confined with GC.

Plaintiff visited the school nurses' office for medical care and treatment for her injuries. Upon her return to the classroom, Plaintiff saw that student GC was in a full rage and had turned over extremely heavy furniture, some of it on their sides.  Ms. Stone was holding the door shut as student GC was screaming and violently opening/closing it.  Plaintiff expressed her concern to Ms. Stone that with furniture tipped over the student could be seriously, if not fatally injured if it wasn't removed.  Plaintiff and Ms. Strong swiftly entered the room and put the furniture in a position where it could not fall on the student.  Following this, Plaintiff left early to get additional medical care.  Plaintiff also filed a workers' compensation claim for the September 28, 2017, assault.  The claim was eventually allowed for both her physical injuries and PTSD. Plaintiff is still treating for PTSD two years later.

Plaintiff's mother, Ms. Mosher, who worked at the school as a substitute, saw Plaintiff leave and was so upset upon seeing her daughter hurt and obviously traumatized, that she broke down and also left early. Ms. Mosher never returned to substitute after that.

COMPLAINT AND JURY DEMAND - 30

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

4.68    On or about September 28th, 2017, Ms. Stone contacted Ms. Kennedy regarding her concerns over Plaintiff's mental health, stating that she is agitated, and emotionally drained. In a later interview, Ms. Stone would elaborate that Plaintiff was 'not like this last year.'

4.69    On September 29th, 2017, at approximately 8:00 a.m., Ms. Stone met with the ISP staff and directed them to 'resume the room schedule that had been utilized prior to this 2 ½ day trial.' Ms. Stone did not consult Plaintiff about this change to her programming.

Near the end of the school day Ms. Stone met with the ISP staff: Ms. LaLanne, Ms. Palomino, and Ms. Orgill, 'talking, listening, smiling, singing.' Plaintiff was not informed of the meetin:

At about 4:50 p.m., Plaintiff spoke with Ms. Sullivan-Dudzic by phone and took detailed notes. Plaintiff expressed to Ms. Sullivan-Dudzic that she was uncomfortable continuing to put student GC under undo stress and that this plan has been traumatizing to her, student GC, the other students on her caseload, and likely other students in the building. Plaintiff further explained to Ms. Sullivan-Dudzic that the other students on her caseload had been through numerous schedule changes due to the directives given to her, and that they were 'bubbling,' meaning that students were becoming more and more agitated. Plaintiff informed her that they need their teacher, and stability back. Ms. Sullivan-Dudzic agreed to call GC's mom and ask her to keep him home until Wednesday to give Plaintiff time to re-establish programming for the other ISP students, and give them some time to settle in so GC could return to a stable environment.

At 5:42 p.m., Ms. Sullivan-Dudzic called Plaintiff back, stating that before she had a chance to call the mom she ran into Ms. Shipp, who had just returned from a law conference. Ms. Shipp informed Ms. Sullivan-Dudzic that at this point we don't want to change the environment to make it easier for student GC to reenter. That the experts needed to see him 'at his absolute worst.' Ms. Sullivan stated that student GC will yell, hit, kick, scream, but this is what they need to see. Plaintiff was literally sickened by the fact that this student would

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

1  intentionally be subjected to an environment that she strongly did not believe to be in his best

2  interest, or hers or the other students.

3       4.70    On September 30, 2017, at 4:33 p.m., Plaintiff contacted Ms. Sullivan-Dudzic.

4  During the forty minute conversation Plaintiff again expressed her strong concern that student

5  GC will be exposed to further trauma if they proceed on Monday with 'the plan.'  Plaintiff told

6  her that she was literally sick with concern over this situation.  Plaintiff reiterated, once again,

7  that this is not the plan she would have designed and that his behavior had obviously escalated

8  since its implementation, and that 'the plan' caused trauma for Plaintiff and her students.

9       4.71    On October 1, 2017, Ms. LaLanne sent an extensive email to Ms. Stone

10  outlining her ideas for Plaintiff's students and the ISP, and her opinion that they would be

11  better off with a 'seasoned teacher.'  Furthermore, Ms. LaLanne stated in the email that she was

12  taking data on a student.  Ms. Stone spoke with Ms. LaLanne the previous school year in

13  regards to taking data and it was not allowed outside of a teacher directive.  Ms. LaLanne

14  frequently took notes in lieu of providing the basic supervisory services to students as directed

15  by her job description. Once again, Ms. Stone took no corrective action.

16       4.72    On October 2, 2017, Ms. Kennedy called Plaintiff to check on her on the

17  recommendation of Ms. Stone, Ms. Shipp, and Ms. Sullivan-Dudzic.  Ms. Kennedy's notes

18  show that Plaintiff explained how she had been repeatedly assaulted by a student, not provided

19  paraeducatorsupport, and then locked in a classroom with the assaultive student by Ms. Stone

20  using a firehose which was intended to protect students and staff from a shooter by locking the

21  shooter out of the classroom.  Plaintiff explained that this was in violation of Pro-ACT and not

22  safe for her or students.  Plaintiff was severely traumatized, and believed student GC to be

23  traumatized as well.

24       4.73    On October 3, 2017, Cristy McCorkle, BEA regional union representative, Mr.

25  Raymond and Plaintiff met in room 111 at KLE to discuss all of Plaintiff's concerns, including

26  being locked in the classroom with a violent student.

27

COMPLAINT AND JURY DEMAND - 32

4.74     On October 4, 2017, student GC 'eloped' to the main road.  Mr. Davis and Ms. Strong followed him two houses down the street before GC decided to return to campus. Student GC was not placed in a hold despite the risk of serious, imminent harm.

4.75     On October 5, 2017, Plaintiff met with Ms. McCorkle, Mr. Raymond, Ms. Sullivan-Dudzic, Ms. Kennedy, and Ms. Stone whereupon it is decided that Plaintiff would be granted a 'day off' from classroom duties so she can begin to put her program back together. Plaintiff spent the day in the building, but was not working with students.  Student GC assaulted peers and staff and threw a bucket of school supplies from a second story window, narrowly missing striking  a volunteer on the head.  Student GC also eloped from the classroom to the main street, heading towards the freeway, as Ms. Stone, Mr. Davis, Ms. Strong, and Ms. Sullivan-Dudzic followed him.  Mr. Raymond yelled from the front of the school to put him in a hold, but student GC was never placed in a hold, despite the likelihood of serious, imminent harm.

At approximately 11:52 a.m., Ms. Shipp contacted Miles ABA (professional behavioral analysts) asking if anyone can come to KLE today as 'the team could really use her skills today.'

District administrators had to stay on campus nearly the whole day to assist with the supervision and care of the student GC.  By end of day, a 1:1 transitional paraeducatorwas finally hired to care for student GC.

4.76     On or about October 6, 2017, Ms. McCorkle met with ISP staff and substitute teacher Mr. Alexander to explain what happened the previous day.  During an afternoon meeting with Ms. Stone, Ms. Sullivan-Dudzic, Mr. Raymond and Plaintiff attending, the group again discussed that Plaintiff is never to be left alone with student GC.  Yet immediately following the meeting, Plaintiff was again left alone with this strong, wiry, extremely violent student who acts out frequently and without warning.  Mr. Raymond later confronted Ms. Stone and Ms. Sullivan-Dudzic about leaving Plaintiff alone again with GC.

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

The same day, Plaintiff consulted with union building representative Shannon Gooding regarding her concern for student and staff safety, being locked in the room, and her belief that she is being retaliated against.

4.77    On October 10, 2017, Plaintiff discovered Ms. LaLanne taking extensive notes and tally data on a student in her care.  This was not directed by Plaintiff and was in clear violation of earlier restrictions put on Ms. LaLanne, who frequently took notes instead of providing supervisory duties of students.  Plaintiff again reported this breach to Ms. Stone.  Plaintiff also asked Ms. Stone if she knew of this or had told Ms. LaLanne to do this.  Ms. Stone responded, '[n]o, why would you think that?'

4.78    On October 11, 2017, during a work session at Naval Avenue Early Learning Center, Ms. Williams informed Plaintiff that she had information that she is being pushed out of her job.  This, she stated, is coming from the district, BSD.  Ms. Williams further elaborated that she had to 'put a strong boundary up with the district,' and that 'Mr. Davis is not to be trusted.'  Ms. Williams further informed Plaintiff that the district would try to push her out of her job by saying she was not able to keep students safe.  This was additional retaliation by BSD against Plaintiff.  Plaintiff then shared with Ms. Williams that Ms. Stone had locked her in the classroom and that she was traumatized.

4.79    On October 12th, 2017, Plaintiff wrote to Mr. Raymond, explaining that she had yet to be able to provide care to the other students on her caseload  as she has been directed to be with student GC, and that she was largely unable to get her lunch and planning done.  Plaintiff also expressed her frustration that she had to 'face her administrator every day after she locked me in a room.'

During that afternoon Ms. Stone 'physically blocked student (GC)' from entering a classroom as he was in a 'highly escalated situation.'  Student GC continued to escalate after this, and eloped to Ms. Williams classroom. When Plaintiff attempted to coax this now highly escalated student from the classroom, he punched her in the chest.  Pro-ACT forbid employees

GALLAGHER LAW OFFICE PS
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

from blocking children as it will escalate them. Plaintiff likely would not have been injured if Ms. Stone would have followed the basic tenets of Pro-ACT and Ms. Shipp's instructions.

4.80    On October 13, 2017, Plaintiff was assaulted by student GC in the same manner as the September 6th, 2017 attack.  When Plaintiff's back was to the door, student GC came at her suddenly, punched her repeatedly in the face and head and pulled her hair.  Plaintiff shouted at GC and immediately began crying and hyperventilating.  The accumulation of trauma was finally catching up with Plaintiff and she could no longer control her response to the repeated instances of largely preventable violence. That was Plaintiff's last day at work.

4.81    On October 25, 2017, the BEA union representatives including Greg Raymond met with BSD administrators including Superintendent Leavell, Assistant Superintendent Steedman, Ms. Kennedy and Ms. Sullivan-Dudzic. The§ primary topic of discussion was 'violent students.' The BEA stated that 'we need a clear and consistent message to all of our staff on what to do when students become violent and especially when they become a danger to themselves, other students, other staff, and property. There is too much confusion and feeling helpless regarding restraint protocol, legal rights, reporting procedures (including calling 911), student removal…' In addition, the BEA noted that 'many teachers, especially those who have been assaulted multiple times are feeling like this scenario is like a broken record. They /we bring this up more than any other topic (by far) and yet it seems like we've made little, if any, progress.'

4.82    On November 5, 2017, Plaintiff emailed a letter to the BSD School Board detailing her experiences with being confined with a violent student and the impact on her life. Plaintiff explained that her 'hope that in telling my story, that you as the board members for the BSD will be compelled to action. It is my greatest desire that my account will not go unnoticed, but rather would be a vehicle for change.'

4.83    Plaintiff sought treatment for her PTSD but BSD, a self-insured employer, did not initially allow Plaintiff treatment and time loss payments for more than three critical months. Not until after an IME in late December, 2017, was Plaintiff's claim allowed and she

COMPLAINT AND JURY DEMAND - 35

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

finally began receiving treatment for her PTSD. As part of BSD's efforts to disallow Plaintiff's workers compensation claim for PTSD, BSD obtained Plaintiff's medical records pre-dating her employment.

4.84    On November 16, 2017, BSD attorney Rachel Miller interviewed Ms. Strong, Ms. Stone, Ms. Shipp, Ms. Orgill, Ms. Palomino and Ms. LaLanne. Although the purported focus was Plaintiff's complaint about being confined in the room with GC, but instead of investigating Plaintiff's complaints, BSD investigated Plaintiff.  Ms. Miller's focus was on Plaintiff's mental health, and how Plaintiff could be at fault for being repeatedly assaulted and confined. Ms. Shipp and Ms. Stone stated that Plaintiff 'seemed manic' and 'escalated all year' with lots of anxiety and wasn't like that the previous year. Ms. Orgill and Ms. Stone referred to traumatic events in Plaintiff's history.  No recommendations or findings were made after the interviews, and no corrective action was taken.

4.85    Plaintiff has not been able to return to work since October 13, 2017, and is still under psychological and psychiatric care for severe PTSD.  One of Plaintiff's therapists describes her condition:

> Ms. Maki was repeatedly assaulted by a student in her classroom starting on September 6, 2017 and ending when she realized that she was having serious trouble and could not go back a little over a month later.  After having reportedly gone to the ER for treatment on different occasions and subsequently having been locked alone in the classroom with him, she began developing panic symptoms, nightmares, flashbacks, a sense of impending doom, emotional numbness, and many other symptoms of PTSD. While she didn't initially know what was going on, this high functioning and highly dedicated teacher was clear that she could not go back to the classroom at that time. She had never before had these symptoms and they were clearly caused by the incidents named above. Moreover, she developed symptoms of depression, as well--a sense of helplessness, hopelessness, inability to feel joy, and so forth. These symptoms continue to plague her, at some times worse than others. The onset was at the same time and has worsened as she has realized the extent of her psychic injury.

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

Plaintiff's therapist further notes that, 'the psychological conflicts regarding (the) level of responsibility with no ability to respond effectively within the institutional milieu is important.  The context within which a trauma takes place is of great importance and this is highlighted by the research on PTSD following the Vietnam War.'

4.86    Plaintiff's suffering continues and was caused by BSD's retaliation, false imprisonment, and negligence, and violation of her constitutional right of liberty.  Plaintiff has suffered special and general damages including, but not limited to, lost wages and loss of future wages and benefits, severe emotional distress--including PTSD, depression, anxiety, fear of children, physical injury, loss of consortium with family members, loss of professional career and associated income and emotional loss all in amounts to be determined but exceeding $5,000,000.

## V. FIRST CLAIM FOR RELIEF
### Negligence

5.1    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

5.2    Defendants breached their duty of care toward Plaintiff when they refused to provide a 1:1 paraeducator for a known violent student in violation of the student's Individual Education Plan (IEP); when they confined Plaintiff alone in her classroom with a known violent student; and when they failed to protect Plaintiff from harm; when they failed to provide Plaintiff training and support necessary to work with violent students; and when escalated the danger to Plaintiff by inconsistently implementing Pro-ACT policies and procedures.

5.3    As a result of Defendant's unlawful acts, Plaintiff has suffered and continues to suffer damages in an amount to be determined at trial.

## VI.  SECOND CLAIM FOR RELIEF
### False Imprisonment

6.1    Plaintiff realleges the preceding paragraphs as though fully set forth herein.

COMPLAINT AND JURY DEMAND - 37

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855.9310 • FAX 206.462.1557
www.nwprolaw.com

6.2     Defendants unlawfully imprisoned Plaintiff when principal Susan Stone placed a portion of a firehose over the outside door hinge of Plaintiff's classroom on September 26, 2017, confining Plaintiff alone with a violent student without consistent monitoring and without providing Plaintiff any reasonable means of escape.

6.3     As a result of Defendants' unlawful acts, Plaintiff has been deprived of her rights and privileges under the law and has suffered and continues to suffer damages in an amount to be determined at trial.

## VII.   THIRD CLAIM FOR RELIEF
### Retaliation – RCW 49.60.210(1)

7.1     Plaintiff realleges the preceding paragraphs as though fully set forth herein.

7.2     Defendants' actions, including confining Plaintiff in her classroom with a violent student and failing to provide 1:1 paraeducator support, constitute retaliation against Plaintiff due to her complaints of sexual harassment by a paraeducator of young disabled male students, and due to Plaintiff's complaints of retaliation, in violation of the Washington Law Against Discrimination, RCW 49.60.210(1).

7.3     As a result of Defendants' unlawful acts, Plaintiff has been deprived of her rights and privileges under the law and has suffered and continues to suffer damages in an amount to be determined at trial.

## VIII.   FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Susan Stone in her Individual Capacity

8.1     Plaintiff realleges the preceding paragraphs as though fully set forth herein.

8.2     Defendant Susan Stone acted under color of state law when she placed a modified firehose on the outside door hinge of Plaintiff's classroom confining her with a violent student, thereby depriving Plaintiff of her right to liberty and exposing Plaintiff to danger she otherwise would not have faced.

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

8.3     As a result of Defendant's unlawful acts, Plaintiff has been deprived of her rights and privileges under the law and has suffered and continues to suffer damages in an amount to be determined at trial.

### IX.  FIFTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Linda Sullivan-Dudzic in her Individual Capacity

9.1     Plaintiff realleges the preceding paragraphs as though fully set forth herein.

9.2     Defendant Linda Sullivan-Dudzic acted under color of state law when she consented to her subordinate, Susan Stone, to place a modified firehose on the outside door hinge of Plaintiff's classroom confining her with a violent student, which Ms. Sullivan-Dudzic should have reasonably known would cause Susan Stone to deprive Plaintiff of her right to liberty and expose her to danger she otherwise would not have faced.

9.3     As a result of Defendant's unlawful acts, Plaintiff has been deprived of her rights and privileges under the law and has suffered and continues to suffer damages in an amount to be determined at trial.

### X.  SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Bremerton School District – Official policy, practice, or custom

10.1     Plaintiff realleges the preceding paragraphs as though fully set forth herein.

10.2     Defendant Susan Stone acted under color of state law when she placed a modified firehose on the outside door hinge of Plaintiff's classroom confining her with a violent student, thereby depriving Plaintiff of her right to liberty; and

10.3     Defendant Susan Stone and Defendant Linda Sullivan-Dudzic acted pursuant to a practice or custom of the Bremerton School District to use a modified firehose, meant for active shooters, to slow down special education students that elope classrooms. The firehoses were provided to all KLE classrooms and at least one other elementary school, and used in both schools during the fall of 2017 when students eloped from their classrooms. Defendant Susan Stone produced and distributed a training video for BSD employees of how to use the firehose on the door hinge.

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

10.4     Defendant Susan Stone and Defendant Linda Sullivan-Dudzic acted pursuant to a policy, practice or custom of BSD to be 'hands off' and 'no holds' with volatile students, so that Plaintiff was unable to protect herself from GC's assaults by appropriate restraint or self defense. Defendants policies caused Plaintiff to be locked in a room alone with a violent student with no way to defend herself.

10.5     As a result of Defendants' policies, practices and customs, Plaintiff has been deprived of her rights and privileges under the law and has suffered and continues to suffer damages in an amount to be determined at trial.

## XI.  SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Bremerton School District – Ratification by Final Policymaker Linda Sullivan-Dudzic

11.1     Plaintiff realleges the preceding paragraphs as though fully set forth herein.

11.2     Defendant Linda Sullivan-Dudzic was a final policymaker for the Bremerton School District's Special Education programs as she is the Director of Special Programs and Elementary Education;

11.3     Defendant Linda Sullivan-Dudzic knew of and specifically approved for Susan Stone to place a modified firehose over the door hinge of Plaintiff's classroom, confining her with a violent student, and depriving Plaintiff of her right to liberty.

11.4      As a result of Defendants' unlawful acts, Plaintiff has been deprived of her rights and privileges under the law and has suffered and continues to suffer damages in an amount to be determined at trial.

## XII.  EIGHTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Bremerton School District – Failure to Train

12.1     Plaintiff realleges the preceding paragraphs as though fully set forth herein.

12.2     Defendant Susan Stone acted under color of state law when she placed a modified firehose on the outside door hinge of Plaintiff's classroom confining her with a violent student.

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

12.3    The training policies of Bremerton School District were not adequate to train school staff, administrators and teachers to handle volatile students.  Pro-ACT was not implemented consistently.  No BSD employee, including Defendant Stone, was trained in how to adequately address a violent student who assaults without antecedent behavior; nor were they trained in how to defend themselves one-on-one with a violent student.

12.4    Bremerton School District was deliberately indifferent to the obvious consequences of its failure to train school staff, administrators, Defendant Susan Stone in particular, and teachers adequately.

12.5    The failure of Bremerton School District to provide adequate training caused the deprivation of Plaintiff's rights by Susan Stone.

12.6     As a result of Defendants' unlawful acts, Plaintiff has been deprived of her rights and privileges under the law and has suffered and continues to suffer damages in an amount to be determined at trial.

## XIII.  JURY DEMAND

13.1    Plaintiff demands that this matter be tried before a jury.

////

////

////

////

////

////

////

////

////

////

////

////

**GALLAGHER LAW OFFICE PS**
10611 Battle Point Drive NE
Bainbridge Island, Washington  98110-1493
TEL. 206.855-9310 • FAX 206.462.1557
www.nwprolaw.com

# XIV.  PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff prays for relief as follows:

A.     For judgment against Defendants, jointly and severally, and an award of damages for mental anguish and emotional distress, and for special and punitive damages in an amount to be proven at trial for violation of RCW 49.60.210(1); and 42 U.S.C. § 1983.

B.     Awarding attorneys' fees and costs pursuant to applicable under RCW 49.60.030(2) and 42 U.S.C. § 1983.

C.     Awarding prejudgment interest on back-pay and accrued interest on the judgment;

D.     Awarding an amount to offset federal income tax consequences of any award as actual damages under *Blaney v. International Association of Machinists and Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 87 P.3d 757 (2004).

E.     Awarding such other and further relief as the court deems just and equitable.

A BOE LAW FIRM PS

By:  /s/ Deborah A. Boe, WSBA #39365
     Deborah A Boe, WSBA #39365
     Email: Deborah.boelawfirm@gmail.com
     5600 Kitsap Way
     Bremerton, WA 98312
     Telephone and Fax: (360) 692-1133

GALLAGHER LAW OFFICE PS

By: /s/ Daniel C. Gallagher, WSBA #21940
     Daniel C. Gallagher, WSBA #21940
     Email:  dan@nwprolaw.com
     10611 Battle Point Drive NE
     Bainbridge Island, Washington  98110-1493
     Telephone:  (206) 855-9310
     Facsimile:  (206) 462-1557

*Attorneys for Plaintiff*

COMPLAINT AND JURY DEMAND - 42